DISTRICT OF OREGON, ss:                    AFFIDAVIT OF KURT M. CZERWIEN

**Affidavit in Support of a Criminal Complaint and Arrest Warrant**

I, Kurt M. Czerwien, being duly sworn, do hereby depose and state as follows:

**Introduction and Agent Background**

1.        I am a special agent with the Federal Bureau of Investigation (FBI) and have been since March 2011. My current assignment is as an investigator on Portland FBI Field Office's Transnational Organized Crime and Violent Gang squad since April 2022. My training and experience include the use of sophisticated investigative methods needed to conduct sensitive national security, espionage, and organized crime investigations. I have conducted investigations into weapons offenses in violation of Title 18 and drug trafficking offenses in violation of Title 21, United States Code, Sections 841 and 846. Through this training and experience, I have become familiar with the manner in which drug traffickers and those who illegally possess firearms use electronic communications to store, transmit, and distribute information to carry out criminal activity.

2.        I submit this affidavit in support of a criminal complaint and arrest warrant for Tracie Ann Harbison (hereinafter "TRACIE") for the crime of the distribution and possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1). As set forth below, there is probable cause to believe, and I do believe, that TRACIE has committed violations of 21 U.S.C. § 841(a)(1) by the distribution and possession with intent to distribute controlled substances.

3.        I submit this affidavit in support of a criminal complaint and arrest warrant for Michael Llanos Jr. (hereinafter "LLANOS"), for the crimes of (1) the distribution and possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1) and (2) Felon

in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1). As set forth below, there is probable cause to believe, and I do believe, that LLANOS is a felon and possessed a firearm in violation of 18 U.S.C. § 922(g)(1) and committed violations of 21 U.S.C. § 841(a)(1) by the distribution and possession with intent to distribute controlled substances.

4.      This affidavit is intended to show only that there is sufficient probable cause for the criminal complaint and requested warrant and does not set forth all of my knowledge about this matter. The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, a review of records related to this investigation, communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and experience.

## Applicable Law

5.      Title 21 U.S.C. § 841(a)(1) prohibits the distribution and possession with intent to distribute controlled substances.

6.      Title 18 U.S.C. § 922(g)(1) prohibits the knowing possession of a firearm and ammunition by a person who "has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year."

## STATEMENT OF PROBABLE CAUSE

### Investigation Background

7.      The Portland FBI, Portland Police Bureau (PPB), and Multnomah County Sheriff's Office (MCSO), and other law enforcement agencies are currently investigating the BROOD gang which constitutes a criminal enterprise that is involved in drug and firearms distribution, robberies, burglaries, and car theft.

### A.    Use of Cooperating Witnesses

8.    Investigators have used information from the following two cooperating witnesses in furtherance of this investigation. These cooperating witnesses are independent of each other and neither cooperating witness knows about the other's cooperation with law enforcement.

Cooperating Witness 1 ("CW-1")

9.    CW-1 has provided information to the FBI for the past five months for consideration on pending charges upon which he/she hopes to receive a reduction or significant benefit. CW-1 has also provided information to law enforcement in exchange for monetary compensation. CW-1 has expressed fear about physical harm that may result from certain criminal groups if CW-1 is identified as cooperating with law enforcement. Based on my training and experience, I know that some criminal groups use violence, threats, and intimidation against their enemies, including cooperating witnesses. Accordingly, to help protect CW-1's safety, I am purposefully limiting details that may help identify him/her. To that end, I am not disclosing the nature of those pending charges against CW-1, whether the charges are state or federal, or whether the charges are in Oregon, or elsewhere. No specific promises or assurances were made to CW-1 regarding any benefit he/she may receive in exchange for CW-1's cooperation in this investigation. CW-1 has a criminal history, including multiple prior arrests and felony convictions. I have reviewed CW-1's rap sheet and found CW-1 received multiple convictions for identity theft and a conviction for the unauthorized use of a motor vehicle. CW-1 has also been arrested but not convicted for other crimes of dishonesty to include forgery and other instances of identity theft. CW-1 has also been arrested for drug possession, theft, and possession of a stolen vehicle. Some of CW-1's information has been corroborated through other

investigative activity. Based on the investigation to date, I believe CW-1's information is truthful and accurate.

<u>Cooperating Witness 2 ("CW-2")</u>

10.      CW-2 has cooperated with law enforcement on at least two occasions during traffic stops in order to avoid arrest. It is my belief that CW-2's cooperation has not extended past the time he/she was detained by law enforcement and is not actively cooperating with law enforcement. CW-2 has a criminal history, including multiple prior arrests and felony convictions. I have reviewed CW-2's rap sheet and found an instance of providing false information to the police as a juvenile. CW-2 was not convicted for this charge. CW-2 has convictions and/or arrests for burglary, unauthorized use of motor vehicles, firearms, theft, robbery I, criminal mischief, elude, assault, possession of stolen vehicle. Some of CW-2's information has been corroborated through other investigative activity. This corroborated information helped lead to the seizure of 19 firearms, a large amount of drugs, and suspected drug proceeds cash from the Tracie Harbison search warrant and the arrest of Tracie Harbison and Michael Llanos. Based on the investigation to date, I believe CW-2's information is truthful and accurate.

**B.      Initiation of Investigation into Tracie Harbison's Drug Trafficking Organization (DTO)**

11.      On or around March 2023, the Portland Police Bureau (PPB) identified a drug trafficking organization (DTO) centered around TRACIE that was operating in Southeast Portland, Oregon which distributed Methamphetamine and Fentanyl. PPB received drug house complaints from neighbors and began investigating the allegations with a series of PPB cases. On March 30, 2023, PPB followed TRACIE and an unknown white male from the driveway of

14185 NE Halsey St, Portland, Oregon to the Goodwill store located at 9015 SE Powell Blvd, Portland, Oregon. There TRACIE met with another unknown male who departed in a gold Chevrolet Blazer. Suspecting a drug exchange had occurred, officers tried to stop the unknown male in the gold Chevrolet Blazer due to an observed traffic violation. The Blazer eluded officers and drove down a bike path where the driver abandoned the vehicle and fled on foot.

12.     Despite officer's efforts to locate the driver, he was not found. Due to the abandoned vehicle's presence on a bike path, officers requested it be towed and inventoried the vehicle. A cell phone was located for which PPB served a seizure warrant then a search warrant. Upon review of the cell phone, the user was identified as Norman Kurth.

13.     PPB's review of Kurth's cellphone found numerous text message conversations between Kurth and suspected drug customers. In these conversations, Kurth and the suspected drug customers used coded drug language to conduct drug sales.

14.     Investigators have been involved in numerous drug investigations and are familiar with drug traffickers' methods of operation, manufacture, transportation, and distribution of narcotics, in addition to the use of coded language to avoid the detection of law enforcement.

15.     In one text message conversation between cell phone number 971-xxx-5492[1] "Emoji Face" and Kurth from March 25, 2023 to March 29, 2023, "Emoji Face" sent Kurth a text message that stated, "Hey where are you I need some powder I got 60". The two then discussed details on meeting up and payment. In another text message "Emoji Face" asked Kurth, "did you get it on your cash app the 20 that they owe you". At one point, Kurth told

---

[1] I know the full phone number, but I am redacting three digits with "xxx" in this affidavit which may become part of the public record. I will use similar "xxx" redactions throughout this affidavit to shield personally identifiable information.

"Emoji Face" that "I am going to a ride from my plug I am on my way from 43".

16.     Investigators understand that "powder" is a term commonly used to refer to Fentanyl powder and plug is a supplier of illegal narcotics. Based on PPB's surveillance of TRACIE and Kurth at the Goodwill on March 29, 2023 and the timing of text messages between Kurth and TRACIE investigators believe that TRACIE was Kurth's plug or drug supplier that he referred to in a text message to "Emoji Face".

17.     Investigators identified on Kurth's phone text messages between Kurth and 503-xxx-5069. According to subpoenaed records, the subscriber for 503-xxx-5069 is Tracie Harbison, Service and billing address: 8511 NE Brazee St, Portland, OR 97220, start date: Sept 07, 2021. In one message from March 18, 2023, Kurth asked TRACIE if he could sell Fentanyl powder for her and promised that he had a lot of customers with cash. Specifically, Kurth stated "O hey do you think you could put me on with a little bit of both I can sale powder like nothing and I no lots of people with cash. Anyways if you could get me started again I will promise I will make you $$$ and I will stay loyal to you."

18.     On March 29, 2023, Kurth and TRACIE have a text message conversation from March 25, 2023 to March 29, 2023 where they discussed details on meeting up, amounts of money Kurth will pay TRACIE, and amounts of suspected drugs. The conversation ends with TRACIE asking Kurth to meet her at the Goodwill on Powell and NE 92nd Ave, which is the location where PPB observed TRACIE meet with the unknown male later identified to be Kurth on March 29, 2023. A March 29, 2023 email from CashApp showed where Kurth paid TRACIE $195.00, which investigators believe to be Kurth's payment for his re-supply of drugs. According to records subpoenaed from CashApp, TRACIE received $195 from Norman Kurth

on March 29, 2023.

19.     Following PPB's inventory of Kurth's abandoned car on the bike path, they
located several small bags of suspected drugs. A plastic bag with white powder of suspected
Fentanyl which weighed approximately 27.6 grams with packaging, a plastic bag with white
powder of suspected Fentanyl which weighted approximately 16.7 grams with packaging, a
plastic bag with brown powder of suspected heroin which weighed approximately 4.3 grams with
packaging, and a plastic bag with a white crystalline residue within it. Officers conducted a NIK
test of the suspected heroin, and it tested presumptively positive for heroin. Investigators had
sent the suspected drugs off to the Oregon State Police Laboratory for testing, but they were not
tested due to the number of items requested. Based on my training and experience, I believe
these quantities to be consistent with distribution quantities of fentanyl.

**C.     Search warrant on Tracie Harbison DTO, 14185 NE Halsey St, Portland,
        Oregon**

20.     On June 5, 2023, the Portland Police Bureau (PPB) executed a search warrant at
14185 NE Halsey St, Portland, Oregon which was being used by TRACIE for the distribution of
controlled substances. During the execution of the search warrant, officers detained numerous
individuals to include TRACIE, Kristi Cullum, Michael LLANOS, and Zachary Smith who were
present inside the residence.

21.     Officers located approximately 486 grams of suspected powdered Fentanyl with
packaging, approximately 761 grams of suspected Methamphetamine with packaging,
approximately 21 grams of suspected heroin with packaging, and approximately 12 grams of
suspected cocaine with packaging in TRACIE's bedroom, identified as Bedroom #3 during the
search.

22.     Investigators also located a digital scale and two suspected drug ledgers in TRACIE's bedroom which contain notes on the names of individuals, amounts, and prices of suspected drugs. Details of the two drug ledgers are further described below in a separate section.

23.     Investigators also found approximately $13,501 in cash and ten handguns in TRACIE's room. The majority of the cash was locked in a safe along with some of the suspected Fentanyl powder and consisted of numerous smaller denomination bills in "$1" and "$5", which I believe to be indications of drug dealing. All ten of the handguns were found locked in a black container in the bedroom. TRACIE told officers approximately where the container was near her bed and that the firearms were hers.

24.     During the search, Cullum told officers that she knew that TRACIE was dealing Methamphetamine for several years and that she would get small amounts from TRACIE for her personal use, but denied knowing that any firearms were in the residence. In total officers located 19 firearms in the residence.

**D.      Department of State Police Forensic Laboratory Drug testing**

25.     On September 21, 2023, the Oregon Department of State Police Forensic Laboratory completed drug testing on some of the drugs that were recovered. Due to the numerous items seized during the search and submitted to the Laboratory for testing only the suspected Methamphetamine and Fentanyl powder from TRACIE's bedroom, Bedroom #3, were tested.

26.     Of the approximately 486 grams of suspected powdered Fentanyl with packaging found during the search, the Laboratory found that the largest item tested, FBI Evidence Item 1B91, which was approximately 419 grams with packaging contained approximately **175.06**

**grams** of Fentanyl, a Schedule II controlled substance. The difference in weight came from packaging that contained two nested zip log plastic bags, one metal plier, one green silicone container, and one piece of foil containing a piece of plastic nested within a red silicone container.

27.     FBI Evidence Item 1B56 which weighed approximately 68.2 grams with packaging contained approximately **16.27 grams**, within a knotted plastic bag, of Fentanyl, a Schedule II controlled substance, the difference in weight being the packaging. FBI Evidence Item 1B55 which weighed approximately 83.3 grams contained approximately **37.04 grams** of Fentanyl, a Schedule II controlled substance, with the difference in weight being the packaging.

28.     The three evidence items contained approximately **228.37 grams** of Fentanyl, a Schedule II controlled substance.

29.     Of the approximately 761 grams of suspected Methamphetamine with packaging, two evidence items were tested, FBI Evidence Item 1B84 and 1B53, which were both found in TRACIE's bedroom, Bedroom #3. FBI Evidence Item 1B84 which weighed approximately 695.2 grams with packaging contained approximately **637.17 grams**, within a zip lock plastic bag, of Methamphetamine, a Schedule I controlled substance. The difference in weight came from the packaging.

30.     FBI Evidence Item 1B53 which weighted approximately 195 grams with packaging contained approximately **151.8 grams**, within six zip lock plastic bags, of Methamphetamine, a Schedule I controlled substance. The difference in weight came from the packaging.

31.     The two evidence items contained approximately **788.97 grams** of Methamphetamine, a Schedule I controlled substance.

### E. Identification of drug dealers in the Harbison DTO

32.     During the June 5, 2023, search of TRACIE's residence, in addition to the controlled substances seized, investigators found and photographed drug packaging material and digital scales. Two ledger notebooks were seized along with TRACIE's cellphone, and the cellphone belonging to LLANOS. A review of the two drug ledger notebooks, TRACIE's cellphone, and LLANOS' cellphone identified several individuals who dealt drugs for TRACIE. These individuals were Norman Kurth, who TRACIE referred to as "Pockets", Yevgeniy Udovikin, who TRACIE referred to as "Eugene", Michael Llanos, who TRACIE referred to as "Pipes" or "Mikey Pipes", Chase Harbison, TRACIE's son, and Zachary Smith.

33.     A review of the drug ledgers identified as FBI Evidence Item 1B88 and 1B90 found the majority of the references and tallies were for Eugene (Udovikin) and Pockets (Kurth). Based on my training and experience, I believe the ledgers consisted of tallies of amounts of money owed from drugs that were fronted by Tracie. I know that drug dealers keep track of the quantities of drugs they have "fronted" – meaning, distributed on loan with the trust that the lower level dealer will pay for the fronted drugs once he makes a profit from selling them. The review of TRACIE's cellphone found messages where she fronted both Eugene and Pockets drugs and each of them often discussed paying off their debt to TRACIE.

34.     The review did not find LLANOS' name or nickname, "Pipes" included in the drug ledger of money owed. In drug ledger 1B90, there was one note to Tracie that is not signed or dated. The note states, "Tracie, Please call me when you wake up. I took an ounce of both and gave you 597." Investigators know that Llanos was staying in the room next door with his girlfriend Kristi Cullum who was TRACIE's roommate. \

/ / /

**F.      Evidence of Michael Llanos' drug dealing on behalf of the Harbison DTO**

35.      Within the three month period from April 2023 to June 2023, CW-1 believed LLANOS was dealing drugs for TRACIE and knew that LLANOS would often receive calls for drugs and sold "powder" which investigators know to be Fentanyl powder. CW-1 knew that LLANOS had recently been romantically involved with TRACIE then started dating her roommate, Kristi Cullum. Investigators knew from speaking with Cullum that she was TRACIE's roommate and was in a relationship with LLANOS. CW-1 knew that LLANOS would receive drugs from TRACIE and would help her obtain additional drugs from suppliers. On at least one occasion within the three month period from April 2023 to June 2023, CW-1 knew that LLANOS was searching for a supply of Methamphetamines and that he had contacted individuals in Portland, Oregon to get re-supplied. CW-1 also knew that LLANOS and Chase Harbison, Tracie Harbison's son, made repeated weekly trips to Eugene, Oregon and believed they were picking up drugs to re-supply TRACIE. Prior to the June 5, 2023, search warrant at TRACIE's residence, CW-1 believed there would be an arsenal of firearms that would include AR-15s and handguns in TRACIE's residence. During the search, investigators located and seized 19 firearms to include multiple AR-15s and handguns from 14185 NE Halsey St, Portland, Oregon.

36.      CW-2's cooperation is limited to several occasions and was not ongoing. This cooperation occurred from approximately March 2023 to June 2023. CW-2 stated TRACIE was dealing drugs at all hours of the day and night from her residence. In late May 2023 to early June 2023 prior to June 5, 2023, CW-2 knew that TRACIE had about two kilograms of Fentanyl powder, a pound and a half of Methamphetamine and $20,000 in a safe in her bedroom. TRACIE also had ten handguns within her bedroom and a rifle behind the front seat of her car parked in

her driveway. CW-2 knew that both Michael LLANOS and Chase Harbison were also dealing drugs for TRACIE. From the June 5, 2023, search warrant on TRACIE's residence, officers located and seized ten handguns from TRACIE's bedroom and amounts of Fentanyl and Methamphetamine that were approximate to what CW-2 had stated would be there prior to the search warrant, along with approximately $13,501 in cash.

37.     From the June 5, 2023, search at 14185 NE Halsey St, Portland, Oregon, Both TRACIE's and LLANOS' cellphones were seized and reviewed by investigators. On August 30, 2023, U.S. Magistrate Judge Youlee Yim You authorized a search warrant to examine the contents of LLANOS' cellphone for evidence of drug distribution and felon in possession of a firearm. On June 8, 2023, Multnomah County Circuit Court Judge Chanpone Sinlapasai authorized a search warrant to examine the contents of TRACIE's cellphone for evidence of drug distribution and Theft by Receiving. The review of both cellphones found numerous messages between TRACIE and LLANOS and others that showed he was directly involved in the Harbison DTO besides living in the same residence. Only some of the messages involving the sale of controlled substances are included below.

38.     LLANOS cellphone was associated with cellphone number 971-xxx-7003 and investigators found the number saved as a contact labeled "Mikey Pipes Newest1" in TRACIE's cellphone. I know that "Mikey Pipes" is a nickname used by Michael Llanos. Investigators found both SMS text messages and Facebook Messenger messages between TRACIE and LLANOS and between other co-conspirators.

39.     On April 26, 2023, LLANOS contacted TRACIE with text messages and asked, "Hey do you have any oil?". Investigators know this reference is to heroin due to its dark color which is often referred to as "oil", "tar", or "black" by criminals to mask the drug being

requested. TRACIE responded back shortly "Yes, I need water. Like a elbow. Jp? Anybody? I have 15 for it." Investigators believe that TRACIE responded that she did have the "oil" or heroin and then asked LLANOS to get her "water" which investigators know to be Methamphetamine due to its clear like nature and is often referred to as "water", "clear", or "aqua".

40. LLANOS responded back to TRACIE and stated, "I will check right now" and a few hours later messaged her to say, "I'm still trying to get that water for you so if you find a fresh spring before I do let me know and then I'm going to need to get some oil from you." TRACIE responded back "I need water" to which LLANOS replied, "I'm check all my resources" and that he may have found her water and was waiting on somebody at that very moment. Approximately one hour later, LLANOS messaged TRACIE that "I'm here" and after another one and a half hours, messaged her again that "Hey Mom are you at the Big House". Investigators know that individuals who are not related to TRACIE often call her "Mom".

41. On May 1, 2023, LLANOS messaged TRACIE and stated "We're you at I need an O of watter" which investigators to believe to be a request for a certain amount of Methamphetamine. TRACIE responded back shortly, "Big house". Investigators know that the "Big house" was 14185 NE Halsey St, Portland, Oregon, where the June 5, 2023, PPB search warrant occurred. They also referred to a tiny home that was moved around from site to site.

42. On May 7, 2023, LLANOS messaged TRACIE, "Can I meet you somewhere 40watter40oil" which investigators know to be amounts of Methamphetamine and Heroin. LLANOS then messaged TRACIE, "If it's going to be a minute let me know wo my Friend don't go somewhere els". Investigators believe this message meant that LLANOS wanted to know if he could get re-supplied with drugs from TRACIE and he didn't want to lose his customer, the

"Friend", to someone else if he couldn't come through with the drugs. Several hours later TRACIE messaged LLANOS that she was headed to the big house. Later that day, LLANOS asked TRACIE if she got his "cash app". A review of LLANOS' and TRACIE's CashApp accounts did not show LLANOS made a successful money transfer that day.

43.    On May 10, 2023, LLANOS messaged TRACIE and asked, "Hay mom was wondering what we Talked about last night was my cost Still 750 for a whole one". TRACIE responded back "Yes pls" and LLANOS asks what would ½ be, "Be 325?" and TRACIE responded back "375". LLANOS stated, "I'm going to need the 1/2 I got to meet him in about an houro." TRACIE replied that she was headed somewhere else but would be coming right back. LLANOS asked TRACIE if she had it on her because he had to meet him at 82nd bar and grill. TRACIE responded back "Yes" and "But I don't have the full one and have to go to the house to get more for you." LLANOS stated he just needed the half right now and asked TRACIE if she had the half on her right now. TRACIE responded, "No. Headed to big to get it." Investigators know the references to "Big" location and "Big house" to be TRACIE's residence at 14185 NE Halsey St, Portland, Oregon.

44.    On May 27, 2023, TRACIE sent a text message to LLANOS and asked if he could get an "elbow" of "water" for her. LLANOS responded and asked, "Are you at home at the big house", to which TRACIE stated she was. LLANOS stated he would check on TRACIE's request and was pretty sure he could. The two exchanged several other messages and TRACIE again messaged LLANOS and stated, "Just need 1." From previous text messages, investigators know that an "elbow" is a pound of illicit narcotics, often used to describe an amount of Methamphetamine. Based on my training and experience, I know a pound of any controlled substance is consistent with a distribution quantity rather than a user quantity.

45. On May 28, 2023, LLANOS messaged TRACIE, "Can I come meet up with you do you have that on you confetti." TRACIE replied back that "I have everything on me." The two then discussed their locations and where to meet up. TRACIE asked LLANOS, "U need a half of confetti?" and LLANOS replied back "Yes." Investigators know that "confetti" is slang for Fentanyl powder and is often referred to as "fety" or "fetty". In one of LLANOS' own messages, he told someone what confetti was.

46. In a Facebook Messenger message string between Michael Llanos Jr and Karrie Heys, on April 14, 2023, Heys asked Llanos "Wya" which investigators believe to me "where are you at". Llanos responds back almost immediately "My house" and then stated, "Trying to sell some dope." Heys then tells Llanos that she needed some and asked if it was good which LLANOS stated, "It is good". They then discussed locations and meeting up. On May 31, 2023, Heys asked LLANOS, "Can you bring me a ball". Which investigators know to be a measurement of drugs. LLANOS responded back, "There's no one here but I'm going to the shop and I'll see if Chase has one." Heys responded back "Okay" and the next day sent LLANOS the message, "Thanks for the ball brother."

47. In another Facebook Messenger message string between Michael Llanos Jr. and Scott Arnell, on March 10, 2023, Arnell asked LLANOS "And I need some hit u got anything". LLANOS responded back the same day, "Clear? I got it whatever you need." Arnell responded back, "Yea clear but that was like 6 hours to late. Lol…I woulda probably gotta way better deal from ya too."

48. On June 2, 2023, Arnell asked LLANOS, "Hey u got some clear" and "I'm in Gresham now but I gotta go pick up kids in Vancouver then come back but I was trying to pick something up real quick before I go." LLANOS responded back, "How much are you trying to

pick up". Arnell replied back, "Depends what how much u do for a ball lol." And "No I got 20 or 30 for now." LLANOS stated, "I am pretty positive I can get you a ball for $30" and "I might have it actually in my pocket right now." The two then discuss where to meet up and LLANOS tells Arnell that he actually has a half ball on him and Arnell can get the other half later.

49.     In a June 3, 2023, message string, Arnell messaged LLANOS, "Hey dad u left me at a strangers house last night. Stranger danger dad wtf." LLANOS replied, "Lol sorry bro I had to go I thought you knew." Arnell then asked LLANOS, "Lol It all good but I still owe u right." LLANOS responded back "Bro I'm not worried about it just don't tell anybody else I gave you a ball for 20 bucks."

50.     In a Facebook Messenger message string between Michael Llanos Jr and Facebook account Beeler Rich that was found during the review of the LLANOS' cellphone, on March 11, 2023, LLANOS messaged Rich, "I got really really really really really good fetty powder that I need to sell like right now I'll sell balls for 150 or 2 grams for 100 bucks or $60 a gram."

### G.     Financial Analysis of CashApp accounts

51.     Investigators became aware that individuals within the TRACIE HARBISON DTO would use CashApp to exchange money. After receiving subpoenaed financial records from CashApp, a financial analysis was conducted. Investigators reviewed TRACIE and LLANOS accounts along with other co-conspirators, to include Yevgeniy Udovikin ("Eugene"), Norman Kurth ("Pockets"), and Chase Harbison.

52.     The financial review period was from January 1, 2021 to August 2023. During this review period, TRACIE received 313 incoming transfers from 46 individuals for a total of $37,229 and sent out 172 outgoing transfers to 28 individuals for a total of $21,687. The most

frequent sender of money to TRACIE was Yevgeniy Udovikin ("Eugene") who sent $12,158 in 97 transactions. Chase Harbison sent TRACIE money in 36 transactions totaling $8,601. LLANOS only sent six transactions to TRACIE from September 2022 to April 2023 which totaled $289.

53.     The primary recipient of TRACIE's transactions was her son, Chase Harbison, who received $13,635 in 75 transactions. In the cellphone review, investigators observed messages of TRACIE sending Chase money to help pay his bills. TRACIE sent Udovikin $2,322 in 46 transactions and LLANOS $400 in two transactions.

54.     Udovikin received 346 transactions from 86 individuals that totaled $24,022. LLANOS received 66 transactions from 24 individuals that totaled $3,297. Chase Harbison received 228 transactions from 39 individuals that totaled $24,773.

55.     I believe the financial transactions that are seen in the CashApp accounts of TRACIE's drug dealers, Udovikin, Chase Harbison, and LLANOS show them collecting money from drug customers. Their CashApp payments to TRACIE show them paying for the product they sold and/or for TRACIE's cut of the profits. I believe that the less amount of CashApp transactions by LLANOS than the others show that LLANOS paid TRACIE mostly in physical cash.

### H.     Firearms seized during June 5, 2023 search warrant

56.     During the June 5, 2023, search warrant on the residence where TRACIE and LLANOS were residing, it was discovered that Kristi Cullum and Micheal LLANOS shared a bedroom in the basement that was labeled as Bedroom #4 during the search. This bedroom was in the basement adjacent to TRACIE's bedroom, Bedroom #3 with a connecting door between the two. Inside Cullum's and LLANOS' bedroom, (hereinafter "Bedroom #4"), was a closet

underneath the stairs where eight firearms and body armor were located. During the search, LLANOS told PPB officers where he resided, which was Bedroom #4. LLANOS stated he shared the bedroom with Cullum and he was storing his personal items there while he went away for mandatory drug treatment. LLANOS told officers that all of his stuff was in the closet underneath the stairs but that he didn't know about the guns or body armor.

57.     After Kristi Cullum was read her Miranda rights, she was interviewed by officers on June 5, 2023. Cullum claimed to not know about any firearms in the house and clearly stated that the firearms found in the search were not hers. Cullum was interviewed several times during the execution of the search warrant while she was detained outside. Following her initial statement about not knowing about the firearms, Cullum then told officers that when the first flash bang went off, LLANOS told her that the house was being raided and that he had brought guns from Chase Harbison over to the house to hide.

58.     On June 7, 2023, Cullum was interviewed by investigators as a follow-up to her previous conflicting statements. Cullum stated she had no prior knowledge of the firearms being in her bedroom. When asked about her statements from June 5, 2023, Cullum stated she lied to the officer about LLANOS saying the guns were his. She made up the story about LLANOS saying the firearms or guns were his to keep her from going to jail. Cullum was cited but not taken into custody on June 5, 2023. Cullum stated that what really happened was she heard the flash bangs and LLANOS asked her what was happening. Cullum told LLANOS they were being raided by the police. Following that, she got up and walked out of the house because she had children inside the house.

59.     Following LLANOS' arrest on June 5, 2023, investigators reviewed Multnomah County Jail calls between LLANOS and Cullum where the two discussed getting married when

LLANOS got out of custody. Investigators knew that the two were romantically involved prior to the June 5 and June 7, 2023 interviews of Cullum.

60.     During the June 7, 2023 interview by investigators after the search warrant, Cullum told investigators that she cleaned out the closet for LLANOS and removed all of her belongings so that LLANOS could store his personal possessions there. Cullum stated that the closet had been locked after LLANOS moved his belongings into it. Several days prior to the date of the search warrant, LLANOS had lost the key to the locked closet door, so he had to break the lock to the closet to access it and it remained unlocked. Cullum did clarify that LLANOS had full access to the residence and would have been over there at times while she was at work.

61.     Inside the closet underneath the stairs in Bedroom #4, officers located a plastic tote that was filled with items associated to LLANOS. The items included an Oregon instructional permit and Oregon identification card that both belonged to LLANOS. There were multiple pieces of mail that were sent to LLANOS but were addressed to 3560 SE Kelly Street. Other personal items included multiple photographs of LLANOS and a prescription bottle with his name on it. Investigators found eight firearms within this same closet though they were not in the same plastic tote as LLANOS' personal items. LLANOS' personal items in the plastic tote and the firearms were in close proximity to each other in the closet.

**I.      Department of State Police Forensic Laboratory DNA testing**

62.     On November 29, 2023, the Oregon Department of State Police Forensic Laboratory completed DNA comparisons of the DNA taken of the firearms found in LLANOS' and Cullum's room and of the consent DNA samples obtained from TRACIE, LLANOS, Cullum, and Zachary Smith.

63. Forensic scientists compared DNA samples taken from Llanos to DNA swabs taken from the eight firearms found in LLANOS' room, specifically in the closet he used as storage. Swabs from one of those firearms, a Glock 19 9mm handgun (SN BNZP686), contained a mixed DNA profile assumed to be from four contributors. LLANOS could not be excluded as a contributor to this DNA mixture. Harbison, Zachary Smith, and Kirsti Cullum were excluded as contributors to this DNA mixture. This handgun was found loaded in a white bag that was moved out of the closet by PPB tactical officers as they finished their final clear of the residence. The firearm was not handled by the officers prior to DNA collection.

**J.    Michael Llanos Jr. (LLANOS) Criminal History**

64. Michael Llanos Jr., aka "Mikey Pipes", is a male, DOB: 4/16/1980. According to a query of a law enforcement database, LLANOS has a 2014 felony conviction in Multnomah County, Oregon for felon in possession of a weapon (Court Case Number 14CR08436) for which he was sentenced to 36 months probation. LLANOS has a 2016 felony conviction in Multnomah County, Oregon for felon in possession of a weapon (Court Case Number 16CR20621) for which he was sentenced to three years probation. LLANOS has a 2016 felony conviction in Clackamas County, Oregon for Attempt to Elude Police Officer and Unauthorized use of a Motor Vehicle (Court Case Number 16CR74882) for which he was sentenced to six months imprisonment and 18 months imprisonment respectively. LLANOS has a 2019 felony conviction in Clackamas County, Oregon for Unauthorized use of a Motor Vehicle (Court Case Number 18CR75482) for which he was sentenced to 20 months imprisonment. LLANOS has a 2020 felony conviction in Multnomah County, Oregon for Unauthorized use of a Motor Vehicle (Court Case Number 19CR15259) for which he was sentenced to 27 months imprisonment. LLANOS has a 2022 felony conviction in Clatsop County, Oregon for Identity Theft (Court Case Number

21CR41813) for which he was sentenced to 18 months probation. Based on the sentences he has served, I believe LLANOS knows he has been convicted of crimes punishable by terms of imprisonment exceeding one year. Those convictions make it unlawful for LLANOS to possess a firearm.

### K. ATF Interstate Nexus review

65.	On or about August 1, 2023, an ATF Special Agent experienced in performing an Interstate Nexus review of firearms, reviewed multiple firearms associated with LLANOS. Included in this review was one Glock 19 9mm handgun with serial number BNZP686. Based on that review, the ATF Special Agent provided a verbal confirmation that the firearm, the Glock 19 9mm handgun, was manufactured outside the state of Oregon. Therefore, it has traveled and/or affected interstate commerce.

### Conclusion

66.	Based on the foregoing, I have probable cause to believe, and I do believe, that TRACIE HARBISON and LLANOS committed the crime of the distribution and possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1). I also have probable cause to believe, and I do believe, that LLANOS committed the crime of Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1). I know LLANOS, as a felon is prohibited from transporting or possessing any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce. I therefore request that the Court issue a criminal complaint and arrest warrant for TRACIE and LLANOS.

67.	Prior to being submitted to the Court, this affidavit, the accompanying complaint and the arrest warrants were all reviewed by Assistant United States Attorney (AUSA) Leah K. Bolstad, and AUSA Bolstad advised me that in her opinion the affidavit and complaint are legally and

factually sufficient to establish probable cause to support the issuance of the requested criminal complaint and arrest warrant.

## Request for Sealing

68.     I further request that this Court issue an order sealing, until further order of the Court, all papers submitted in support of the requested arrest warrant, including the application, this affidavit and the requested arrest warrant. I believe that sealing these documents is necessary because the information to be seized is relevant to an ongoing investigation, and any disclosure of the information at this time may seriously jeopardize this ongoing investigation. Premature disclosure of the contents of this the application, this affidavit, the attachments, and the requested search warrant may adversely affect the integrity of the investigation.

*/s/ by telephone*
KURT M. CZERWIEN
FBI Special Agent


Sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at 3:30 p.m. on December 14, 2023.

HONORABLE JOLIE A. RUSSO
United States Magistrate Judge